**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **GS HOLISTIC, LLC,** | : | **CASE NO. 3:23-cv-00294** |
| **Plaintiff,** | : | **District Judge Walter H. Rice**<br>**Magistrate Judge Michael R. Merz** |
| **v.** | : | |
| **M.W. & Sons, Inc., et al.,** | : | |
| **Defendants.** | : | |

DEFENDANTS M.W. & SONS, INC., MAHMOUD WAHDAN, AND MONEER WAHDAN'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. CIV. R. 56; MOTION FOR LEAVE TO FILE IN EXCESS OF TWENTY (20) PAGES *INSTANTER*

Pursuant to Fed. Civ. R. 56, Defendant M.W. & Sons, Inc. ("M.W."), Defendant Mahmoud Wahdan ("Wahdan"), and Defendant Moneer Wahdan ("Moneer") (collectively "Defendants"), through counsel, hereby move the Court for summary judgment as against Plaintiff GS Holistic, LLC ("Plaintiff"). Defendants respectfully request that the Court grant it leave to file in excess of the twenty (20) page limit under Loc. R. 7.2, as the issues surrounding this case, and its companion sister case *GS Holistic, LLC v. PQR Enterprises, Inc.*, Case No. Case No. 3:23-cv-00317 are complex due to the expert report as submitted by Plaintiff. Defendants request leave to discuss this expert report in detail, and provide new financial numbers to the Court based upon a proper valuation of Defendants' businesses. For this reason, Defendants respectfully request the Court grant them leave to file twenty-five (25) pages instead of twenty (20).

In addition, Defendants respectfully request that this Court grant judgment in their favor and dismiss Plaintiff's claims against them with prejudice. Plaintiff cannot hold an individual officer of a corporation liable absent a showing of a willful violation of the Lanham Act. Therefore, Plaintiff's claims as to Wahdan should be dismissed with prejudice. In addition, Plaintiff has failed to prove by a preponderance of the evidence that it has sustained actual damages from M.W.'s alleged sale(s) of infringing water pipe(s) to Plaintiff's own investigator, as none of the water pipes Defendants had for sale were actually sold to the public.

Most importantly, however, based on Plaintiff's own expert's calculations contained in its expert report and as submitted with its Motion for Default Judgment, even if liability existed, M.W. would owe Plaintiff approximately $900.00. This calculation aligns with Plaintiff's actual damages, as Plaintiff's corporate representative testified that Plaintiff sells its waterpipes to distributors for approximately $300.00 each. Therefore, even if liable, Plaintiff has only suffered actual damages of $900.00 and should be entitled to no more than the minimum statutory award of $1,000.00 plus costs. No genuine issue of material fact remains, as these calculations are based on Plaintiff's own expert report. A memorandum in support follows.

Respectfully submitted,

FREDRIC L. YOUNG (0059544)
CARIN E. BIGLEY (0090231)
GREEN & GREEN, Lawyers
800 Performance Place
109 North Main Street
Dayton, Ohio 45402
Phone: (937) 224-3333
Fax: (937) 224-4311
E-mail: flyoung@green-law.com

cebigley@green-law.com
*Attorneys for Defendants, M.W. & Sons, Inc., Mahmoud Wahdan and Moneer Wahdan*

MEMORANDUM

## I. INTRODUCTION

Wahdan and Moneer (collectively "Individual Defendants") and M.W. (collectively "Defendants") do not dispute that Plaintiff GS Holistic, LLC ("Plaintiff") holds valid trademarks related to the Studenglass brand. The issues presently before this Court are as follows:

(1) Can an individual officer of a corporate entity be held liable for an alleged violation of the Lanham Act (15 U.S.C. § 1111, *et seq*.) absent evidence of willful intent and/or special circumstances resulting in the alleged violation?

(2) Where a violation of the Lanham Act occurs absent willful and/or malicious intent, knowledge, and/or foresight, is a trademark owner entitled to a statutory damage award that far exceeds the actual damage sustained based on the trademark owner's own expert testimony?

(3) Can a corporate entity be held liable for an alleged violation of the Lanham Act where the only sale(s) of the allegedly infringing product were made to the trademark owner itself and not the actual public?

Defendants respectfully request that this Honorable Court find that an individual officer cannot be held liable for a violation of the Lanham Act where said officer had no knowledge or foresight of the alleged infringement. In addition, where the only sale(s) of an infringing product were sold back to the entity attempting to enforce the trademark violation itself, no damage has occurred and the alleged infringer should not be held liable. Further, even where liability can be found absent a willful and/or malicious intent, a trademark owner should not be entitled to a statutory damage award far exceeding the actual damage sustained where the damage sustained is nominal, at best.

No genuine issue of material fact is in dispute. Defendants purchased what they believed to be legitimate products from what they also believed, at all relevant times, to be a licensed retailer of Plaintiff's products. It was not until this lawsuit was filed that Defendants had even heard of the

brand Studenglass, as Wahdan's second language is English.[1] All Wahdan knew about the purchase of the allegedly infringing products[2] was that they were waterpipes. Three (3) waterpipes were purchased by M.W. and were on M.W.'s shelf for one (1) year prior to Plaintiff purchasing the waterpipes via its own agent / investigator. The mere display of an allegedly counterfeit product one (1) year, with the only sales being made back to the trademark owner itself should hardly be classified as anything more than mere nominal damages, at best. Most importantly, however, Defendants did not have the requisite intent necessary to justify the exorbitant award of damages Plaintiff is seeking in this case (and has sought against similar, small business owners in over 1,000 cases across the United States over the past three (3) years).

For the foregoing reasons, Wahdan and Moneer respectfully requests that the Court grant them summary judgment and dismiss Plaintiff's claims against them with prejudice, as their actions were neither intentional nor willful. M.W. respectfully requests that the Court grant it summary judgment and dismiss Plaintiff's claims against it with prejudice, as Plaintiff cannot reasonably be considered to have been "injured" or "damaged" where it purchased the allegedly infringing products itself. In the alternative, should the Court find any of Defendants liable in this case, Defendants request that any award of damages to Plaintiff be just and equitable, as Plaintiff has incurred nominal damages at best – approximating to around $900.00 based on Plaintiff's own expert calculations.

## II. APPLICABLE FACTS AND PROCEDURAL HISTORY

Wahdan and Moneer are fifty percent (50%) shareholders of M.W. (Wahdan / M.W. Dec. at ¶ 2 (Jul. 1, 2026)) (Moneer Dec. at ¶ 2 (Jul. 1, 2026)). On June 20, 2022, Moneer and Wahdan

---

[1] Wahdan's first language is Arabic and he has resided in the United States and State of Ohio since approximately 2007.

[2] The allegedly infringing waterpipes bearing the mark Studenglass, as owned by GS Holistics, will hereafter be referred to as "waterpipes."

purchased three (3) waterpipes that are the subject of this litigation from a third-party, MOJO Wholesale ("MOJO"). (Wahdan Dec. at ¶ 6) (Moneer Dec. at ¶ 4) (Exhibit A). The purchase made on behalf of M.W. ("M.W.") was made within the scope of the day-to-day business activities of M.W. (Id.). Defendants made this purchase while acting as agents on behalf of M.W. (Id.).

On October 12, 2022, Wahdan purchased two (2) additional waterpipes that are the subject of the companion, sister case, *GS Holistic, LLC v. PQR Enterprises, Inc.,* 3:23-cv-00317. (Wahdan Dec. at ¶ 7) (Exhibit B). This purchase was made on behalf of PQR within the scope of PQR's day-to-day business activities. (Id.). Wahdan made this purchase while acting as an agent for PQR, in his capacity as a business owner and manager thereof. (Id.).

The waterpipes did not sell well at either PQR or M.W. due to their high price. (Id. at ¶ 8). At M.W., the waterpipes sat on the shelf for over an entire year, until they were purchased by an investigator acting on behalf of Plaintiff. (Wahdan Dec. at ¶ 9) (Moneer Dec. at ¶ 6). At PQR, the waterpipes sat on the shelf for approximately nine (9) months, until they were purchased by an investigator acting on behalf of Plaintiff. (Wahdan Dec. at ¶ 11). Wahdan, whose second language is English, had no understanding or intent to violate Plaintiff's trademark, in either his individual capacity or on behalf of either of his corporate entities. (Id. at ¶ 12). Individual Defendants did not even understand what exactly the "Studenglass" brand was until Plaintiff's litigations commenced against him. (Wahdan Dec. at ¶ 13) (Moneer Dec. at ¶ 7). At no relevant time did any Defendants purchase and/or sell the waterpipes to intentionally, willfully, and/or maliciously violate Plaintiff's trademark. (Wahdan Dec. at ¶ 14) (Moneer Dec. at ¶ 8).

Further, at all relevant times, Individual Defendants believed that the waterpipes were legitimate, authentic purchases. (Wahdan Dec. at ¶ 15) (Moneer Dec. at ¶ 9). At all relevant times, Individual Defendants believed that the waterpipes were being sold by a licensed dealer, through

MOJO. (Wahdan Dec. at ¶ 16) (Moneer Dec. at ¶ 10). This is evidenced simply by viewing the top of the receipt for PQR, which states "MOJO Wholesale Lic. No. 92100684." (Wahdan Dec., Ex. B). Therefore, Individual Defendants, acting upon information and belief, could not reasonably be said to have intentionally violated Plaintiff's trademark when they personally believed, at all relevant times, that the waterpipes were both legitimate and authentic.

On September 27, 2023, Plaintiff sent a "Notice of Violation of U.S. Federal Law" to Defendants ("First Notice"). (Id. at ¶ 17, Ex. E). In the First Notice, Attorney Gabrielle Alexa Penalta ("Attorney Penalta"), on behalf of Plaintiff, states,

> "We are preparing a lawsuit against you and your store due to this violation, which we intend to file in the next 2 weeks. However, before we go to that expense, I am extending an offer to settle this issue amicably…Our goal is to fix this situation, not to hurt you [sic]. However, we must discourage your continued sale of counterfeit Studenglass products, **as well as recoup our expenses for our investigation.**
>
> "This letter is a one-time opportunity for you to call me to resolve this violation…**If I do not hear from you in a week, I will file a federal lawsuit against you.** That is where things become much more expensive, as a federal lawsuit is an extremely serious matter."

(Ex. E) (**Emphasis added**). Wahdan never "called to resolve the situation amicably" because he did not receive the letter until after Plaintiff filed its lawsuit. (Id. at ¶ 17). Upon further investigation, a former PQR employee received it and did not provide it to him. (Id.).

On October 2, 2023, Plaintiff filed a Complaint against Defendants for a willful violation of counterfeiting and/or infringing a federal trademark, pursuant to 15 U.S.C. § 1114 and a willful violation of false designation of origin and/or unfair competition, pursuant to 15 U.S.C. § 1125(a). (Doc. 1). After commencing suit, Plaintiff sent another "Notice of Violation of U.S. Federal Law"

to Defendants which claims to have been served by a process server (hereafter "Second Notice"). (Wahdan Aff., Ex. E). The Second Notice,[3] also sent by Attorney Penalta, states,

> "…[O]ur investigator purchased a counterfeit Studenglass infuser from your store. This is a serious violation of federal law, and you are now being sued by my client in Federal Court..
>
> "As counterfeits are flooding the market, to address the problem, **I am authorized to make a surprising offer**, as our goal is to clean up the marketplace, not to cause you any pain [sic]. **We prefer to convert offenders into honest merchants** of legitimate products.
>
> "**The cost of fighting this case could easily be more than an expensive new car.** We believe that we have a way to work this out which will save you that expense, **but to get the benefit of this program, you need to call me within 1 week** from when you received this letter."

(Id.) (**Emphasis added**). Even the Fair Debt Collection Practices Act ("FDCPA") requires a creditor to give a debtor thirty (30) days to respond to a demand letter, yet Plaintiff only provided Defendants (one of which does not even speak English as a first language) with a mere week to respond and enter into Plaintiff's "program." (Id.).

Summons was allegedly served upon M.W. on December 27, 2023 at 6:15 p.m. via corporate service upon its registered agent, Wahdan. (Doc. 8). The description of Wahdan is an Arabic male with black hair, aged 50, approximately 5'7" tall, weighing 200 pounds, and not wearing glasses. (Id.). Summons was allegedly served upon Moneer the same day through personal service. (Doc. 9). Moneer is described as being an Arabic male with black hair, aged 35, also approximately 5'7" tall, weighing 200 pounds, and not wearing glasses. (Id.). Then again, on the same date, Wahdan was allegedly served through personal service as well. (Doc. 10). However, on the same date and time, Wahdan suddenly is described as being an Arabic male with black hair,

[3] The First Notice and Second Notice will collectively be referred to as "U.S. Federal Law Violation Notices."

aged 40, approximately 5'8" tall, again weighing 200 pounds, but this time he was wearing glasses. (Id.).

Of particular note is a comparison of service affidavits in the companion sister case of PQR. In that case, the process server alleged that PQR was served via corporate service of the registered agent upon Wahdan on October 26, 2023. (See *GS Holistic, LLC v. PQR Enterpr., Inc.*, Case No. 3:23-cv-000317, Doc. 9). The description of Wahdan in October of 2023 is an Arabic male with black hair, aged 45, approximately 5'7" tall, weighing 200 pounds, and not wearing glasses. (Id.). Subsequently, on December 14, 2023, Wahdan is allegedly served through personal service. (Doc. 9-1). However this description of Wahdan is an Arabic male, aged 65, also approximately 5'7", but this time weighing 240 pounds and with black and grey hair. (Id.).

On June 21, 2025, Plaintiff filed a partial motion for summary judgment as to the validity and ownership of its trademarks and Defendants' alleged infringement thereof. (Doc. 24). On June 27, 2025, Plaintiff filed a Motion for Default Judgment against both Defendants. (Doc. 25). On August 15, 2025, defense counsel appeared and were ultimately granted an extension of time to respond to Plaintiff's pending motions. (Doc. 31; Doc. 33; Doc. 34). On November 13, 2025, the Court granted Plaintiff partial summary judgment as to the activity, validity, and ownership of the trademarks, but denied Plaintiff default judgment due to the discrepancies in the accounts of the process servers. (Doc. 35). On November 21, 2025, M.W. filed its Answer. (Doc. 37).

Throughout the companion sister case, there were several disputes between opposing counsel regarding communication, settlement, and/or discovery, memorialized in various Status Reports, Affidavits, and Motions for Reconsideration submitted to the Court. (See *GS Holistic, LLC v. PQR Enterpr., Inc.*, Case No. 3:23-cv-000317, Doc. 36, 37, 38, 39, 41, 44, 58, 59, 60, 63, 64). Plaintiff's counsel has historically submitted Status Reports to the Court that required defense

counsel to submit rebuttal Affidavits and/or Motion for Reconsideration to correct the record. (Id.). As a result, Defendants' attorney fees and expenses have directly increased as a result of Plaintiff counsel's conduct, resulting in a clear failure to mitigate damages by reducing the funds available for settlement.

The first Status Report, submitted by Plaintiff's local counsel John Ridge ("Attorney Ridge") claimed that Plaintiff's counsel had not heard from defense counsel after attempting to communicate. (Doc. 36) (Doc. 37). This resulted in lead defense counsel Fredric Young ("Attorney Young") having to draft and file an Affidavit correcting the incorrect record provided to the Court, explaining that defense counsel had already made multiple attempts at settlement prior to the submission of the First Status Report. (Id.).

Most recently, Plaintiff's General Counsel Eddy Leal ("Attorney Leal") submitted a Status Report to the Court stating that Defendants were not even represented by counsel and that he had not been able to communicate with Defendants to coordinate discovery. (Doc. 58). Attorney Young requested that Attorney Leal correct the record immediately, but Attorney Leal failed to do so for two (2) days. As a result, the Court issued an Order extending the discovery deadline to June 12, 2026 and that Defendants could be sanctioned for failure to participate. (Doc. 59). This resulted in Defendants having to expend more attorney fees to file a Motion for Reconsideration as well as a corrected Status Report. (Doc. 61).

Following this, Attorney Leal attempted to get the discovery deadline pushed back yet again upon defense counsel serving Notice that it would be deposing Plaintiff's corporate representative. Attorney Leal claimed that Plaintiff could not produce a corporate representative on the date indicated (the same date as proposed by Attorney Leal for all of Defendants' depositions) despite having over 100 cases currently pending on behalf of Plaintiff in U.S. District

Courts across the country. On June 11, 2026, the Court then had to hold a status conference on to understand the alleged discovery dispute ongoing between the parties. This resulted in the discovery deadline being pushed back to June 23, 2026. (Doc. 65).

Based on a PACER search, since 2023 alone, Plaintiff has filed 1,001 cases against various defendants in U.S. District Courts across the country; Plaintiff has also filed two (2) appeals in the Ninth Circuit and the Eleventh Circuit. The Eleventh Circuit issued an unpublished *per curiam* opinion on January 23, 2026 affirming the U.S. District Court of the Middle District of Florida's dismissal without prejudice as a sanction against Plaintiff for failure of Plaintiff's prior counsel to attend the final pre-trial conference. *GS Holistic, LLC v. Zaidal Blue Sky Investments Corp., et al.*, 11th Cir. No. 24-14233 at 2 (Jan. 23, 2026). The Eleventh Circuit aptly noted, "…in so doing, the [District Court] explained that 'dismissal was warranted' because 'counsel's absence at the final pretrial conference was merely part of the Ticktin Law Group's long history of violating court orders and rules.'" *Id*.

In *Blue Sky Investments*, Honorable Judge Harvey E. Schlesinger gave a thorough overview of GS Holistics' litigation practices through its counsel while prosecuting these Lanham Act cases across the country. *GS Holistics v. Zaidal Blue Sky Investments Corp., et al.*, M.D. FL, Case No. 3:22-cv-1217-HES-SJH, Doc. 59, Or. (Oct. 23, 2024).

> "The Ticktin Law Group has an extensive, well-documented history of violating court orders, the Federal Rules of Civil Procedure, and the Local Rules…Because counsel has persistently violated the Local Rules, multiple courts in this district have dismissed cases by the Ticktin Law Group.
>
> "Though many violations…are relatively minor, some have been egregious enough to warrant sanctions. On May 12, 2023, the Honorable Virginia M. Hernandez Covington sanctioned [Attorney] Penalta under Rule 11 because she '**made misrepresentations to the Court** which were objectively frivolous and **which she knew to be false**,' '**never had evidentiary support for [the plaintiff's] trademark infringement' claims**, and 'doubled down on th[o]se claims despite actual knowledge that they were untrue.'"

*Id.* (Citations omitted) (**Emphasis added**). Indeed, it was Attorney Penalta that sent Defendants the "U.S. Federal Law Violation Notices" that essentially told them to pay a fine or they would end up spending "almost the cost of a new luxury vehicle" in litigation costs – which is exactly what occurred in the case at bar. (Wahdan Dec., ¶¶ 21, 25-26). Despite the clear sanctioning of its legal counsel, Plaintiff never stopped prosecuting its voluminous number of alleged trademark infringement cases and continues (albeit with new counsel) to obtain substantial default judgments against various "offenders" on a nationwide basis. With this historical record in mind, this case is now before the Court on Defendants' Motion for Summary Judgment.

## III. LAW AND ARGUMENT

### A. Standard of Review

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Cohen v. Mohr*, Case No. 2:15-cv-431, 2016 WL 5387694, *1 (S.D. Ohio September 27, 2016); citing *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 251-52 (1986). This Court must view the evidence in the light most favorable to the non-moving party. *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

The moving party is entitled to summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986)). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Id*. at 325.

B. Plaintiff GS Holistic's claims as to Defendant Mahmoud Wahdan should be dismissed with prejudice because a corporate officer cannot be found liable for a violation of the Lanham Act absent a showing of willfulness or other special circumstances.

"Strict liability [under the Lanham Act] does not extend to the officers of a corporation selling an infringing product." *GS Holistic, LLC v. A to Z Smoke Shop, Inc.*, E.D. Wis., Or., Case No. 1:23-cv-01056, Doc. 26, at 9 (Dec. 19, 2025). In *A to Z*, Honorable Judge Pamela Pepper reversed a jury's award of over $2 million in damages and granted the individual officer's Motion for Judgment as a Matter of Law ("JMOL") on the basis that an individual officer of a corporate entity, while acting under the capacity of his corporate entity, cannot be held liable under the Lanham Act. *See generally, id.* Judge Pepper provided a thorough review and analysis of the Lanham Act, specifically as related to the case of *Dangler v. Imperial Mach. Co.*, 7th Cir. No. 3645, 11 F. 2d 945 (1926).

> "[I]n the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction…it is when the officer acts willfully and knowingly – that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability – that officers are held jointly with the company."

*Id.*, citing *Dangler* at 947. Judge Pepper reasoned that "[i]f a corporate officer or owner of a business could always be held strictly liable as a 'seller' [under the Lanham Act], Dangler's 'special showing' requirement would have no meaning." *A to Z* at 19. "If officers or owners were personally liable for their corporation's infringement based solely on their role or ownership interest, owners and officers would be liable as a matter of course, which is plainly not what *Dangler* envisioned." *Id.*, citing *Century 21 Real Est., LLC v. Destiny Real Est. Props.*, No. 11-CV-38, 2011 WL 6736060 at 7 (N.D. Ind. Dec. 19, 2011).

Summary judgment should be granted to Defendants where the "only evidence of personal participation was that the officers had purchased and resold the infringing products, stating that **'the fact that the Individual Defendants knowingly sold product that turned out to be infringing does not establish that they knew the product was infringing at the time they sold it.'**" *Id.* at 23, citing *Top Tobacco, L.P. v. Midwestern Cash & Carry, LLC*, No. 11 C 4460, 2014 WL 243431 at 7 (N.D. Ill. Jan. 22, 2014) (**Emphasis added**).

> "[P]ersonal participation under *Dangler* means that the corporate officer must have had a hand in designing, selecting or continuing to sell the infringing product **with knowledge or notice that the product infringed upon another's intellectual property.** That standard aligns with the Lanham Act's standard for willful infringement, which requires that a defendant act with knowledge or willful blindness toward the trademark holder's rights. *Id.* at 24, citing *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992). This makes sense; *Dangler* states that a corporate officer is liable when he 'acts willfully and knowingly.' Applying a lower standard would lead to corporate officers being held liable simply by virtue of their position in the corporation, which functionally would eliminate *Dangler's* 'special showing' requirement."

*Id*. at 24. Where there is no evidence to suggest that an individual officer or owner "knew that the pipes were counterfeit when he approved the initial order, and no evidence that [an individual officer or owner] continued to purchase and sell the counterfeit pipes after receiving notice…that the products were counterfeit...[t]he evidence is insufficient to make out *Dangler's* special showing for individual officer liability." *Id*. at 25.

Plaintiff cannot meet *Dangler's* "special showing" in this case because Individual Defendants had no notice of any alleged violation until after this lawsuit was filed. (Wahdan Aff. at ¶ 17). Wahdan did not receive the "U.S. Federal Law Violation Notices" until after lawsuit commenced. (Id.). The only evidence Plaintiff has provided as related to intentional conduct is the various Declarations of Christopher Folkerts ("Folkerts"), Plaintiff's CEO and an expert report that is almost identical to both cases. In his "Declaration as to Damages" in support of default judgment, Folkerts reasons that because Defendants are "in the business of selling waterpipes and

accessories," therefore, they "should know the actual value of an authentic Studenglass product." (Folkerts Decl., Doc. 25 at 22, ¶ 16). Based on this leap of logic, Folkerts concludes, "[a]s such, the Defendants have willfully infringed on Plaintiff's Trademarks." (Id. at 22, ¶ 17).

At his deposition, Folkerts adopted all prior Declarations made in both cases as his testimony made under Oath. (Exhibit H – Folkerts Depo. 7:7-9 (Jun. 22, 2026)).[4] In those multiple Declarations, Folkerts repeatedly claims that Defendants' conduct was intentional. (Doc. 26 at 22, ¶ 17) (*PQR Enterpr., Inc.*, Case No. 3:23-cv-00317, Doc 17 at 22-23, ¶ 11, 16-17). When asked how he knew Defendants acted intentionally, Folkerts claimed that "willfulness is a broad category," and simply because Defendants had multiple stores, they somehow "underst[ood] that counterfeits were a problem in the industry, but [did not have] anything in place for counterfeiting or any kind of counterfeit infringement," their actions were intentional. (Folkerts Depo. 24:9-19). Further, Folkerts claims that because Defendants did not attempt to contact Plaintiff, that inaction exhibits willfulness. (Id. at 24:20-25).

Later, however, Folkerts admits that he had no knowledge of Defendants' thought processes and/or "what they were thinking." (Id. 41:18-42:5).

> Ms. Bigley:
>
> Q. Why did you not sue the distributor on this case?
>
> A. What is and isn't happening in ongoing investigations, I can't comment on.
>
> Q. Okay. Were you aware in this case that my clients thought that the product was legitimate Studenglass product?
>
> A. I'm not aware of what your clients were and weren't doing, thinking…
>
> Q. Okay. But you were aware that their intentions were willful is what you stated earlier?
>
> A. That – that is correct.

---

[4] Folkerts' deposition has not yet been certified by Plaintiff. However, Defendants are submitted the uncertified copy to the Court due to the scheduling deadline for dispositive motions.

(Id.). Despite admitting that he was not aware of what Defendants were and were not thinking, Folkerts still maintained that Defendants' actions were willful. (Id. 42:3-5). This logic is *non sequitur*. Folkerts cannot simply allege intentional conduct when he has never spoken to Defendants, visited their stores, read their financial documents, and/or watched their depositions. (Id. 42:3-17). If he has not reviewed their financial documents, he cannot attest to damages either. (Id.). For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss Plaintiff's claims against them with prejudice.

C. <u>Even if the Court finds one or more Defendants liable, damages should be limited to the minimum statutory award of $1,000.00 under 15 U.S.C. §1117(a).</u>

"Monetary recovery for violations of the Lanham Act…entitles the plaintiff to recover the infringing defendant's profits, any damages sustained by the plaintiff, and the costs of the action." *Luxottica Retail N. Am., Inc. v. CAS-MAN, Inc.*, Case No. 1:10-cv-374, 2011 U.S. Dist. LEXIS 15603 at 14-15 (S.D. Ohio Jan. 14, 2011). "Thus, under the Lanham Act, in assessing profits the plaintiff shall be required to prove defendant's sales only." *Id*. at 15, citing 15 U.S.C. § 1117(a). "As such, any doubts about the actual amount of gross sales or profits will be resolved against the infringing party." *Id*., citing *Pearle Vision, Inc. v. Star Vision Centers, Inc.*, Case No. 08-00046-CG-C, 2008 U.S. Dist. LEXIS 45253, 2008 WL 2329196 at 2 (S.D. Ala. 2008).

In addition, attorney fees are only permitted in "exceptional cases." *Id*. at 19. The acts of infringement must amount to "malicious, fraudulent, willful, or deliberate" intent. *Id*. Because Plaintiff cannot establish that Defendants' actions were malicious, fraudulent, willful, or deliberate, Plaintiff should not be awarded costs and/or attorney fees. This holds especially true where, as here, Plaintiff's counsel has repeatedly been sanctioned in other district courts across the country, as discussed above, and undertaken litigation as a means to intimidate Defendants into selling its products whilst making misrepresentations to the Court regarding Defendants and the

status of this litigation during the pendency of not only this case, but multiple other cases throughout the country. As explained by Honorable Judge Magistrate Merz in *GS Holistic, LLC v. Mr. Vapor Smoke Shop, LLC*, Case No. 1:23-cv-00677, 2024 U.S. Dist. LEXIS 140319 at 4-5 (S.D. Ohio Aug. 7, 2024), "Plaintiff's failure to seek preliminary injunctive relief also suggests it did not expect or suffer lost profits during the pendency of the case. The only documented sale of an infringing product is that sale to Plaintiff's investigator." *Id*. at 6.

Statutory damages in excess of $1,000.00 are unjust in this case, as well as the plethora of other cases currently pending in the Southern District brought by Plaintiff. Defendants agree with Magistrate Judge Merz, in his Decision denying Plaintiff's Motion for Default Judgment in *Mr. Vapor Smoke Shop.* In that Decision, Magistrate Judge Merz held that Plaintiff failed to offer "evidence of any attempt to obtain discovery from Defendants. If Plaintiff had sought discovery and Defendants have refused to provide it, the proper remedy is a motion to compel…" *Id*. at 4. At no point in this litigation did Plaintiff ever request Defendants' financial information. Plaintiff failed to issue Requests for Admission, Interrogatories, and Requests for Production. Instead, only when Plaintiff decided to take deposition did it erroneously claim that Defendants had been unwilling and/or refused to participate in the discovery process and that Defendants were unrepresented by counsel – both of which were incorrect.

In support of its damages claims, Plaintiff submitted an expert report that is substantially identical in nature to the companion case. Compare, (Exhibit I – Expert Reports filed in this case and *GS Holistic v. PQR Enterpr., Inc.*, 3:23-cv-00317, Doc. 17 at 135-161). To the extent Plaintiff's Expert Reports are considered by this Court, utilizing the same methodology as Plaintiff's "expert," Defendants would owe Plaintiff approximately $607.85 in this case. If Plaintiff had conducted discovery and requested Defendants' financial information, it would have been able to

obtain an Expert Report with proper business valuations. However, it failed to do so and instead relied on depositions to attempt an imputation of "willfulness" to obtain excessive statutory damages against Defendants.

First, Plaintiff's Expert Reports should not be considered by the Court to the extent that it includes "Comparable Transactions" from different States. The Expert Reports compare income from Illinois, Missouri, and Ohio. (Id. at 139, ¶ 19). In Figure 1, the average sales in Illinois is $265,000.00; Ohio is $300,000.00; and Missouri is $552,000.00. (Id.). Illinois has a difference of $35,000.00 less than Ohio. (Id.). Missouri, however, has a difference of $252,000.00 more than Ohio. (Id.). At no point in his Expert Report does Plaintiff's expert explain why he would compare Ohio with Missouri, other than to inflate Plaintiff's damages. The inclusion of Missouri results in a Price / DE difference of 2.8x on average between the three States, versus a standard Price / DE of 2.1x for Ohio. (Id.). Plaintiff's expert also fails to explain why he could not just use Ohio as the model as opposed to including two (2) other States with no economic rationalization for these particular two (2) States to be included. (Id.). Plaintiff's expert concludes that M.W. has an average revenue of $372,333.33 – the exact same revenue as PQR in the companion sister case.[5] (Id.). This is approximately $190,644.67 more than what PQR made in gross sales in 2023 ($227,878.00 total in gross sales) which does not include deductions (assuming Plaintiff's best case scenario). (Wahdan Dec., Ex. G-1). When considering the actual cost and deductions, PQR only made $101,737.00 in gross profit for the year 2023, which is an actual difference of $270,596.33. (Id.). The estimations of Plaintiff's expert simply do not align with Defendants' actual business revenue and should not be considered by the Court.

[5] Plaintiff's expert reaches this conclusion despite the fact that M.W. had been in business several years; whereas PQR had only been in business one (1) year. This in and of itself proves that Plaintiff's expert valuations cannot be relied upon, because the actual difference in profit between the two (2) companies is over $7,000.00.

Second, based on Plaintiff's expert calculations and Defendants' actual earnings, when recalculated using the entirety of PQR's 2023 total income of $101,737.00, the DE would be approximately $5,086.85. This amount cannot be claimed as damages though, because Defendants only purchased three (3) waterpipes from the third-party infringer. In his deposition, Folkerts stated that Plaintiff sells its waterpipes to wholesalers for $300.00 each. (Depo. at 19:2-21). This means at a minimum, any amount sought by Plaintiff must be reduced by fifty percent (50%), because that is the amount of actual income Plaintiff would have made for each waterpipe sold. Plaintiff does not make the full retail value of $600.00. (Id.). Regardless, it does not follow when utilizing basic math and actual numbers attributable to M.W. that Plaintiff's damages, at most would be $5,086.85 according to their expert, when the actual damages sustained were a mere $900.00 ($300.00 times two (2) waterpipes purchased). This is approximately 17.69% more in damages than Plaintiff actually sustained. At best, even assuming "marketing" and "social media costs" are taken into account as Folkerts discussed in his deposition, the $5,086.85 attributable to DE for M.W. should be reduced by fifty percent (50%) to $2,543.43 as the most that Plaintiff can recover from M.W. (Folkerts Depo. at 33:2-25).

It should be noted here that in Folkerts' deposition, defense counsel referenced approximately $12,000.00 in DE as being attributable to Plaintiff's damages according to its own expert calculations. The $12,000.00 referenced by defense counsel was based on M.W.'s actual ordinary business income, once all deductions in profit were calculated pursuant to its taxes. However, M.W.'s ordinary business income for 2023 was $5,907.00. (Ex. G-1). In reality, this entitles Plaintiff to five percent (5%) per its own expert calculations of $12,157.00, or $607.85 in actual damages. This number is more on par with what M.W.'s DE actually would have been, assuming M.W. sold the waterpipes at a profit. M.W. purchased each waterpipe for $150.00 and

sold two (2) of them for $311.84 to Plaintiff's own investigators (total sale of $623.68), for an alleged profit margin of $173.68. (Ex. D – Ptf. PQR Investigation) (Wahdan Dec. ¶ 11). The other one (1) broke, resulting in a net loss of $150.00 to M.W. Therefore, Defendants actually lost $150.00 and received a mere $23.68 in profit, not accounting for cost of ordinary business deductions.

Third, Plaintiff's expert then utilizes calculations through the year 2029 to estimate what earnings Defendants would allegedly have made that contribute to Plaintiff's economic loss of market share. Plaintiff's expert, however, fails to explain why calculations are made to the year 2029, when none of the waterpipes remained in the store past 2023. In essence, Defendants merely displayed Plaintiff's product on their shelves for approximately a year by which time, two (2) had been purchased by Plaintiff and one (1) had broken. (Wahdan Dec.). None of the products were even sold to the public or any third-parties. (Id. at ¶¶ 9-11). Therefore, Plaintiff cannot claim (as Folkerts did in his deposition) that Plaintiff has been "harmed" by the sale of a fake product to which Plaintiff would allegedly be responsible for a ten (10) year warranty. (Folkerts Depo. at 22:2-21). Notwithstanding the ten (10) year warranty, Folkerts does not explain why he would be responsible for said warranty for a product that allegedly infringes his trademark anyway. If Plaintiff has the ability to conduct "investigations" for trademark violations across the country in such a wide scale and manner, then Plaintiff also has the ability to filter out which products are counterfeit upon receipt and then simply decline to honor the ten (10) year warranty.

Fourth, in his Declaration (adopted at his deposition), Folkerts asserts that it was difficult to even enter the market due to all of the "counterfeit products" that already existed. (Folkerts Depo. at 27:3-20).

> "Q. How did you have trouble entering the – could you explain a little bit more about how you had trouble entering the marketplace?

> A. I think this is just a little bit of a – as far as continuously entering new products into the marketplace, I think is the – is the intent of – of this. But ultimately, as we iterate or try to get ahead of this, we have found that it – it again, with the devastating impacts that – that anything that we've done, being able to try to get ahead of that has been difficult for us to continue to enter products into the market.
>
> Q. Okay. So are you saying that the counterfeit products are already in the market before the genuine product?
>
> A. No.
>
> Q. Okay. We'll just move on…"

(Id. at 27:9-25). Folkerts also claims in this Declaration that Plaintiff, "essentially already occupies the market sector of smoke shops in various states, including Ohio…" (Folkerts Decl., Doc. 17 at 22, ¶ 15). However, at his deposition, Folkerts was unable to even provide a single number for the amount of wholesalers that Plaintiff has in Ohio. (Folkerts Depo. at 19:2-4). It does not follow that Folkerts can testify, and submit an expert report, claiming that PQR should have made a total of $1.12 million off of his products over a ten (10) year period, yet cannot even articulate the amount of wholesalers he has in Ohio. As someone that allegedly worked directly with the expert in developing his (identical) expert report, Folkerts should easily have been able to state how many wholesalers operate in Ohio and how much of his product was (or reasonably could have been) sold during the relevant time frames. Folkers failed to link any of these logical assertions together.

Fifth, if Defendants stopped attempting to sell Plaintiff's products within one (1) year, then the calculations of Plaintiff's expert related to a ten (10) year period are moot because Defendants' income as related to the "Accused Products" effectively reached $0.00 beginning in 2024. Essentially, there is a one (1) year window of time that Plaintiff can estimate its lost earnings on – from the time Defendants purchased the waterpipes until the time they were removed from their shelves. Plaintiff cannot impute income to Defendants where Defendants could not possibly have benefitted from sales of the waterpipes when none of the waterpipes remained for sale. This leaves Plaintiff's actual loss to be the amount of money that it would have received by selling a genuine,

authentic waterpipe through a wholesaler. According to Folkerts, that amount is $300.00, because Plaintiff sells products to wholesalers for half of its retail price. Therefore, the most economic harm impugned on to Plaintiff by the facts as alleged in this case is $300.00 multiplied by three (3) waterpipes, to equal approximately $900.00.

And while Folkerts asserted that "much more" goes into these calculations than actual damages sustained, if Folkerts cannot identify where Defendants poached business from a single wholesaler to Plaintiff's detriment by identifying an actual sustainable loss, then Plaintiff's recovery should be de minimis, if not nominal in its entirety. Plaintiff opted to obtain statutory damages based on the "inability to conduct discovery," when at all relevant times, Defendants' financial information was available had they simply been asked through the proper course of discovery. Instead, Plaintiff erroneously claimed that Defendants were not complying, misrepresenting the same to the Court, yet no discovery had ever been issued to provide a proper business valuation.

In summation, there are multiple calculations as related to Plaintiff's own expert's calculations. When utilizing the actual numbers, Defendants should not be liable for more than $607.85 based on the expert calculations. However, giving Plaintiff the benefit of the doubt and not even deducting M.W.'s expenses without looking at the actual ordinary business income, at most damages should be limited to the time of the products' display on Defendants' shelves (e.g. 2023) and the five percent (5%) attributable to Defendants' DE based on total income ($101,737.00), which would be $5,086.85 reduced by fifty percent (50%) which is what Plaintiff would actually have received in a best case scenario. In short, at best Plaintiff is entitled to $2,543.43, on average Plaintiff is entitled to $607.85, and at worst Plaintiff is entitled to $23.68 when considering that Plaintiff has not even been harmed where a Defendant has not made a profit

and ends up with a negative net value from purchasing the waterpipes. Regardless, Plaintiff failed to properly mitigate its damages in this case based upon the procedural history provided above, and damages should be apportioned accordingly. Defendants are essentially defunct and out of business now due to this litigation, while being essentially uncollectible. (Wahdan Dec. ¶¶ 21, 25-26). For the foregoing reasons, Defendants respectfully request that if the Court finds a violation occurred, the Court award Plaintiff nominal damages.

D. Plaintiff GS Holistic's claims as to PQR Enterprise, Inc.'s should be dismissed with prejudice because no actual damage occurred where the allegedly infringing product was only sold to Plaintiff itself.

"[A] nominal damages award makes that party that is successful on the claim a prevailing party. *Yellow Book USA, Inc. v. Brandeberry*, No. 3:10-cv-025, 2013 U.S. Dist. LEXIS 745576 at 24 (S.D. Ohio May 28, 2013), citing *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 555 (6th Cir. 2008). "The award of nominal damages, however, highlights the party's failure to prove actual, compensable injury, and the only reasonable fee for the party receiving nominal damages is usually no fee at all." *Id*. Damages were not warranted where a company operated at a loss, despite projecting a profit for the current fiscal year, and the alleged offending company had not acted in bad faith. *Amerestate, Inc. v. Pace Mortg. Corp.*, No. C-3-89-281, 1992 U.S. Dist. LEXIS 22742 at 23 (S.D. Ohio Jun. 10, 1992). If a trademark owner cannot produce any evidence of actual damages, "the principles of equity weigh against an award of damages." *Id*.

Last year, Plaintiff operated at a loss of approximately $1.4 million. (Folkerts Depo. at 7:10-25). Plaintiff had no profit whatsoever for the year of 2025. (Id.). Plaintiff operated negative $1.4 million. (Id.). Further, the Studenglass brand is only seventy percent (70%) of Plaintiff's total business. (Id. at 8:5-10). And, when asked, Plaintiff could not even give an apportionment of business profits for Ohio, let alone the entire region. (Id. at 8:11-17). Thus, even if Plaintiff had

made a profit in 2025 (which it did not), it cannot reasonably measure damages for the State of Ohio as provided in its expert reports if it cannot even distinguish what profits are related to Ohio and what profits are related to other States. For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss Plaintiff's claims against them with prejudice.

## IV. CONCLUSION

As stated by this Honorable Court in *Amerestate*, equity weighs against an award of damages in the case at bar. Wahdan had no ill will or malicious intent in purchasing the waterpipes from a third-party infringer. Thus, Wahdan should not be held liable for any violation of the Lanham Act – particularly considering Wahdan did not even know what the Studenglass brand meant, and English is only his secondary language. Therefore, Defendants respectfully request that this Court hold where a trademark owner cannot prove an individual officer of a corporation cannot be held liable for a violation of the Lanham Act, absent direct proof that the alleged infringer acted willfully and/or intentionally.

Utilizing Plaintiff's own expert testimony and calculations, Plaintiff should receive nominal damages or, at a minimum, the bare statutory award of $1,000.00. In a variety of scenarios, Plaintiff's actual damages range from $23.68 to $607.85 or from a mere $900.00 of actual loss up to a maximum amount of $2,543.43. Depending upon what calculation is utilized, the maximum amount of actual damages provided for is based off the total gross profit of M.W., which is not even the number that should be considered because it does not account for ordinary business expenses incurred. For this reason, if awarded damages at all, Plaintiff should only receive $607.85, which is the actual DE according to Plaintiff's expert witness when calculated subject to M.W.'s business expenses. Therefore, Defendants respectfully request that even if the Court finds

that Plaintiff's trademark to have been infringed, Plaintiff will not be awarded excessive statutory damages in excess of $2,543.43. Even in the best case scenario, Plaintiff has sustained minimal damages and an award of $1,000.00 in statutory damages is more than reasonable. However, pursuant to this Court's prior ruling in *Amerestate*, given that M.W. received $23.68 in profit, coupled with the fact that Plaintiff operated at a $1.4 million loss last year, the most equitable relief would be $0.00 with no award of damages.

Further, the only damage done in this case was that M.W. placed the waterpipes on its store shelves for approximately one (1) year. Given Plaintiff's "difficulty entering the market," inability to attribute a percentage or allocation of profits to Ohio, and a total loss of profits of $1.4 million for 2025, it logically follows that any alleged infringement by Defendants actually benefitted Plaintiff by putting their products onto shelves for customers to view. In fact, Plaintiff admitted that its original intent was to "convert" Defendants into "honest merchants" of its products, according to Attorney Penalta in her "Notice of Violation of U.S. Federal Law." Therefore, Defendants respectfully request that the Court find that a corporate entity cannot violate the Lanham Act when the only sale of the allegedly infringing product was to the trademark owner itself. Plaintiff cannot reasonably be said to have been damaged in this case. Given all the facts and circumstances surrounding this case (and its sister cases), the equity weighs in favor of a nominal damage award, if any. For the foregoing reasons, Defendants respectfully request that this Honorable Court grant them judgment in their favor on all counts.

Respectfully submitted,



FREDRIC L. YOUNG (0059544)

CARIN E. BIGLEY (0090231)
GREEN & GREEN, Lawyers
800 Performance Place
109 North Main Street
Dayton, Ohio 45402
Phone: (937) 224-3333
Fax: (937) 224-4311
E-mail: flyoung@green-law.com
cebigley@green-law.com
*Attorneys for Defendants, M.W. & Sons, Inc., Mahmoud Wahdan and Moneer Wahdan*

CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been filed electronically through the Court's electronic filing system on the date stamped above. Notice was sent to all parties by operation of the Court's electronic system. Parties may access this filing through said system.

FREDERICK L. YOUNG (0059544)
CARIN E. BIGLEY (0090231)